UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMOS WINBUSH III and TIFFANY
WINBUSH, individually and on behalf of their
minor children, K.W. and S.J.W.,

                              Plaintiffs,

          -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; BOARD OF EDUCATION OF
THE CITY SCHOOL DISTRICT OF THE
CITY OF NEW YORK; NEW YORK CITY
COMMUNITY SCHOOL DISTRICT 2;
MAGGIE SIENA, in her individual capacity;
and CASEY COREY, in her individual
capacity,

                              Defendants.

---

1:23-CV-01320-LTS

MEMORANDUM OPINION AND ORDER

      Amos Winbush III and Tiffany Winbush, individually and on behalf of their minor

children, K.W. and S.J.W. (collectively, "Plaintiffs"), bring this civil rights action against the

New York City Department of Education ("DOE"), New York City Board of Education ("BOE"),

and New York City School District 2 ("District 2" and, collectively, the "Municipal Defendants")

as well as Peck Slip School Principal Maggie Siena ("Principal Siena") and Peck Slip School

Assistant Principal Casey Corey ("AP Corey" and, collectively, the "Individual Defendants").

Plaintiffs bring claims pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et

seq. ("Title VI"), 42 U.S.C. § 1983 ("Section 1983"), and the New York State Human Rights

Law, N.Y. EXEC. LAW § 290 et seq. ("NYSHRL").  Plaintiffs allege that the Municipal and

Individual Defendants unlawfully discriminated and retaliated against their children on the basis

of their race while the children attended District 2 New York City Public School 343, also known

as the Peck Slip School ("Peck Slip").  Plaintiffs seek damages in addition to declaratory and injunctive relief.  The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

Defendants now move to dismiss Plaintiffs' first amended complaint (docket entry no. 29 ("First Amended Complaint" or "FAC")) for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.  (Docket entry no. 34 (the "Motion").)  The Court has reviewed the parties' submissions thoroughly and, for the following reasons, Defendants' Motion is granted in part and denied in part.

BACKGROUND

The following allegations are taken from the First Amended Complaint and are presumed true for the purposes of this motion to the extent they are not conclusory.

Plaintiffs are the parents of two Black children who attended Peck Slip from 2016 to 2023.  (FAC ¶¶ 52, 135, 193.)  Plaintiffs' older child, K.W., enrolled in Peck Slip's pre-K program in 2016 and was in the fifth grade at the time at the time the FAC was filed.  (Id. ¶¶ 52, 121; see docket entry no. 37 ("Pls. Mem.")) at 23.)  Plaintiffs' younger child, S.J.W., enrolled in Peck Slip's pre-K program in 2021 and continued to attend the school until the spring of 2023, when his parents withdrew him "as a last resort to protect their child from a racially hostile environment."  (FAC ¶¶ 135, 193.)  Plaintiffs allege that there were multiple incidents, beginning in 2016, in which their children were subjected to racial harassment and bullying from their peers, and retaliation from Peck Slip employees.  (See id. ¶¶ 1-9.)

Plaintiffs allege that K.W. faced racialized bullying from her peers beginning when she enrolled in Peck Slip's pre-K program in 2016.  (Id. ¶¶ 52, 54.)  K.W. was the only

Black student in her pre-K class, and she was one of only two Black students in all of the pre-K classes at Peck Slip.  (Id. ¶ 53.)  During two separate incidents in K.W.'s pre-K year, a White student made racialized remarks to K.W., telling her that her "teeth stink" and "were brown because she was brown," and that he wanted her "to have flowers in her hair," implying that her hair smelled bad.  (Id. ¶¶ 54, 60.)  After the first incident, K.W.'s father insisted that the school form a Diversity and Inclusion Committee; school administrators agreed to do so.  (Id. ¶¶ 57, 58.)  The second incident was reported to Principal Siena, but she did "not acknowledge or address it."  (Id. ¶¶ 60, 61.)  In January 2017, when K.W. was attacked by two White students who yelled at her and struck her in the face, the administration "took no steps to protect K.W. from further racism, bullying, and harassment."  (Id. ¶¶ 62, 64.)

K.W. continued to face racism and harassment during the 2017-2018 school year when she was in Kindergarten.  (Id. ¶¶ 78-79.)  Plaintiffs filed a complaint through the DOE's online portal in February 2018 to discuss "the racism K.W. was experiencing at Peck Slip and the school's failure to meaningfully address it."  (Id. ¶ 70.)  Mr. Winbush was subsequently contacted by phone by a District 2 official, who, after listening to Mr. Winbush's description of the incidents that K.W. had experienced at Peck Slip, stated, "that does not sound like racism to me," "refused to connect [Mr. Winbush] with the Chancellor's office" after Mr. Winbush requested to speak with the official's supervisor, and hung up the phone when Mr. Winbush asked what other options were available "to address the situation" at Peck Slip.  (See id. ¶¶ 70-74.)  That semester, in March 2018, a White student told K.W. that "she needed to take a bath, shower and scrub her skin really hard because her skin is brown and that's dirty."  (See id. ¶¶ 76-78.)  Around April 2018, another White student told K.W. that her skin looked like the color of "pooh."  (Id. ¶¶ 82-83.)  Mr. Winbush contacted Principal Siena about these incidents, and

Plaintiffs allege that, while Principal Siena acknowledged that "more needed to be done to curb the behavior," "no efforts were made." (Id. ¶¶ 80-81, 84-85.)

At some point during K.W.'s Kindergarten year, Mr. Winbush contacted City Councilwoman Margaret S. Chin and New York State Senator Kevin Parker who, upon information and belief, brought the issues concerning K.W.'s harassment to the attention of DOE officials in or around April 2018. (Id. ¶ 82.) Mr. Winbush was thereafter contacted by District 2 Superintendent Bonnie Laboy, who agreed to meet with Mr. Winbush on May 2, 2018, to discuss the harassment K.W. was experiencing at Peck Slip. (Id. ¶¶ 86-87.) During this first meeting, Superintendent Laboy "agreed that more needed to be done and a follow-up meeting was scheduled," but, during the May 17, 2018, follow-up meeting, at which Principal Siena was also present, Superintendent Laboy did not address the substance of Mr. Winbush's concerns. (Id. ¶¶ 87-89.) Following the second meeting, "no steps were taken by school or district officials to stop" the harassment that K.W. was experiencing at Peck Slip, and "K.W. continued to experience racial abuse and harassment at school." (Id. ¶ 90.)

During the 2018-2019 school year, in April 2019, one of K.W.'s classmates called her a loser because "all brown people are losers," and she was told by classmates during two separate incidents that she could not participate in activities with them "because she was brown," and "because her hair did not blow in the wind." (See id. ¶¶ 91-93.) School employees and administrators were "dismissive" when Plaintiffs raised these incidents to them. (Id. ¶¶ 95-96.)

Plaintiffs detail five incidents in December 2019 and January 2020, when K.W. was in second grade, in which K.W. was bullied by White students throughout. During one incident, a White student took Play-Doh from K.W. (Id. ¶ 98.) Later in December 2019, four White students spat food in K.W.'s face and down her shirt, took her coat and headband outside

during recess, and spat food on her again.  (FAC ¶ 100.)  K.W. told the recess monitor, who did

not act to address the situation.  (Id. ¶ 101.)  Mr. Winbush contacted the new District 2

Superintendent, Donalda Chumney, and District 2 Executive Superintendent Marisol Rosales

about these incidents, but was told by Superintendent Chumney that she had visited the school,

and had observed the students "happily playing together."  (Id. ¶¶ 102-103.)

       When the same four students subsequently attacked K.W. another day during

recess, kicking and hitting her in her legs and stomach, Principal Siena made those students

apologize to K.W., but also made K.W. apologize to them.  (Id. ¶¶ 105, 106.)  K.W.'s father

emailed Principal Siena about the incident, but Principal Siena allegedly "took no meaningful

steps to respond."  (Id. ¶ 109.)  In January 2020, three White students gave K.W. "a racist picture

they had drawn of her with a big butt," and a week later, when a White male student taunted

K.W., Principal Siena pulled K.W. out of her classroom and spoke to her aggressively, even as

K.W. attempted to tell her that she had been bullied.  (Id. ¶¶ 110-112.)

       Plaintiffs' allegations regarding K.W.'s third, fourth, and fifth grade years

primarily focus on K.W. feeling isolated from her peers due to racism and bullying, including

being regularly excluded from online breakout rooms during the COVID-19 pandemic.  (See id.

¶¶ 117-121.)  In January 2023, when the Winbushes notified K.W.'s teacher and Principal Siena

that a student had "exhibited toxic behavior towards K.W.," having "yelled at and taunted K.W.,

kicked and pushed her, turned other classmates against K.W.," and followed her off campus, AP

Corey told Plaintiffs that "school administrators found no evidence of bullying," and K.W.'s

teacher told her that she found it "too difficult" to separate that student from K.W.  (See id.

¶¶ 128-134.)  "Recently," a White classmate also told K.W. that, if she wanted to play, she

"would have to play as her assistant." (Id. ¶ 128.) Plaintiffs note that this latter comment came during the same school year that the class was assigned a project on slavery. (Id. ¶¶ 122-127.)

Plaintiffs allege that S.J.W. faced similar racialized harassment, bullying, and retaliation when he enrolled in Peck Slip's pre-K program during the 2021-2022 school year. (Id. ¶¶ 135, 136.) In or around October 2021, a White student punched S.J.W. in the face, told him that his skin was "the color of pooh," and punched him for a second time later that month. (Id. ¶¶ 138-47.) When Mr. Winbush complained to S.J.W.'s teacher after the first incident, the teacher and school administrators took no steps to prevent the White student from attacking S.J.W. again. (Id. ¶¶ 140-41.) After the second incident, Mr. Winbush emailed S.J.W.'s teacher, who replied that she did not find the White student's behavior to be malicious, and AP Corey similarly "defended" the White student after Mr. Winbush reported the student's conduct to her. (See id. ¶¶ 145-49.) The same White student later threatened to kill S.J.W., and in April 2022, attacked S.J.W. again, leaving a large bruise on his legs and scratches on his face and back, which school administrators chalked up to "rough play." (See id. ¶¶ 151, 159-60.) Plaintiffs also allege there were disparities in the way other students were punished as compared to S.J.W., and that Mr. Winbush raised this issue with S.J.W.'s teacher and AP Corey. (Id. ¶¶ 155-57, 160-63.)

During the 2022-2023 school year, when S.J.W. was in Kindergarten, a second student threatened to kill S.J.W. and kicked him in the stomach. (Id. ¶ 165.) The same student chased S.J.W., ripped his shirt, and once again threatened to kill him in January 2023. (Id. ¶ 170.) In response, and at Mr. Winbush's request, Principal Siena and Assistant Principal Corey told the Plaintiffs they would separate the children, but the children were still assigned to sit at

the same table when S.J.W.'s father visited the school.  (Id. ¶¶ 170-174.)  On January 31, 2023, the student spat in S.J.W.'s face without provocation.  (Id. ¶ 176.)

Plaintiffs' attorneys sent a letter regarding K.W. and S.JW.'s experiences of racialized bullying and Peck Slip's purported failure to adequately respond to Principal Siena, AP Corey, the District 2 Superintendent, and the DOE General Counsel on February 1, 2023, and received no response.  (Id. ¶¶ 179-82.)  Plaintiffs' attorneys sent a second letter on February 9, 2023, to the DOE Chancellor, DOE General Counsel, and District 2 and Peck Slip leadership "to identify . . . specific acts of retaliation . . . that occurred in response to the February 1 letter."  (Id. ¶ 222.)  Specifically, K.W.'s teacher "admonished K.W.'s class" by telling them not to go home and tell their parents "what happens in the classroom because it paints the teachers in a bad light," and "punished K.W.'s class" by cancelling a planned trip and certain lunch privileges. (Id. ¶¶ 183, 185.)  K.W. was also "reprimanded . . . because of her father's complaints about racial discrimination" by Principal Siena and AP Corey after the two had pulled K.W. out of class and brought her to Principal Siena's office.  (Id. ¶ 186.)  On March 1, 2023, the day after Principal Siena and AP Corey were served with the original Complaint filed in this action, AP Corey approached S.J.W. in the hallway and "made him so uncomfortable" that he ran away from her.  (See id. ¶¶ 189-92.)  After this incident, the Winbushes withdrew S.J.W. from Peck Slip.  (Id. ¶ 193.)  They assert that they did not do so willingly and that it was a "decision made under duress and as a last resort to protect their child from a racially-hostile environment."  (Id. ¶¶ 193, 194.)

Plaintiffs initiated this action on February 16, 2023, asserting Title VI and Section 1983 unlawful discrimination and retaliation claims, as well as an NYSHRL claim for unlawful discrimination.  (Docket entry no. 1.)  Plaintiffs filed their First Amended Complaint on June 16,

2023, in response to Defendants' motion to dismiss the original complaint.  (Docket entry no. 26;

FAC.)  Defendants filed the instant motion to dismiss on July 7, 2023.  (See Motion.)


DISCUSSION

Defendants, arguing that K.W. has completed her elementary education at Peck

Slip and that S.J.W. no longer attends the school, seek dismissal of Plaintiffs' claims for

declaratory and injunctive relief pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure for lack of subject matter jurisdiction.  (Docket entry no. 35 ("Defs. Mem.") at 16-18.)

Defendants also seek dismissal of the FAC pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure for failure to state a claim upon which relief can be granted.  Defendants assert

that Plaintiffs' claims concerning events prior to July 2, 2019, are time-barred, that Plaintiffs fail

to plead sufficient allegations to assert Monell liability against the Municipal Defendants, and

that Plaintiffs failed to file the requisite notice of claim for their NYSHRL claim.  (See Defs.

Mem.); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

Rule 12(b)(1) Standard of Review

"A district court properly dismisses an action under Fed. R. Civ. 12(b)(1) for lack

of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate

it,' such as when . . . the plaintiffs lack constitutional standing to bring this action."  Cortland St.

Recovery Corp. v. Hellas Telecomms., S.A.R.L., 790 F.3d 411, 416-17 (2d Cir. 2015) (citation

omitted).  "Standing doctrine functions to ensure, among other things, that the scarce resources

of the federal courts are devoted to those disputes in which the parties have a concrete stake."

Klein v. Qlik Techs., Inc., 906 F.3d 215, 222 (2d Cir. 2018).  "In contrast, by the time mootness

is an issue, the case has been brought and litigated, often . . . for years."  Id. (quoting Friends of

the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 191 (2000)).  The burden of

establishing standing falls on the plaintiff.  Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d

581, 603 (2d Cir. 2016).  By contrast, the "heavy" burden of showing mootness falls on the

defendant.  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); see also Mhany Mgmt.,

Inc., 819 F.3d at 603.  "When a defendant moves to dismiss under Rule 12(b)(1) for lack of

subject matter jurisdiction, and also moves to dismiss on other grounds . . . the Court must

consider the Rule 12(b)(1) motion first."  Bobrowsky v. Yonkers Courthouse, 777 F. Supp. 2d

692, 703 (S.D.N.Y. 2011) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n., 896 F.2d 674, 678

(2d Cir. 1990)).

 Defendants argue that Plaintiffs' claims for declaratory and injunctive relief are

moot because (1) K.W. finished the fifth grade at the end of 2023 (the last grade offered at Peck

Slip), and (2) Plaintiffs withdrew S.J.W. from Peck Slip on March 1, 2023.  (Defs. Mem. at 16-

17.)  Plaintiffs, however, explicitly allege in the FAC that the Winbushes "did not willingly

withdraw S.J.W. from Peck Slip, and that "it was a decision made under duress to protect their

child from a racially-hostile environment.  (FAC ¶¶ 193, 194.)  Indeed, Plaintiffs assert in their

Complaint that they "intend to re-enroll S.J.W. at Peck Slip when there is no longer a racially-

hostile environment at the school."  (Id. ¶ 195.)  Defendants do not identify any allegations in the

FAC that contradict Plaintiffs' intent to re-enroll S.J.W, nor do Defendants proffer any other

reasoning to support their assertion that the claims are no longer live.  (See Defs. Mem. 16-18.)

 Where a student-plaintiff has expressed a clear intent to return to the student's

former school, and defendants are unable to establish facts contradicting that intent or rendering

such re-enrollment impossible, courts have typically held that the plaintiff's case is not mooted

simply because a parent removes his or her child from an allegedly improper or hostile learning

environment while seeking judicial relief.  See, e.g., Hudson ex rel. Hudson v. Bloomfield Hills Pub. Schs., 108 F.3d 112, 113 (6th Cir. 1997) (holding that plaintiff's Individual with Disabilities Education Act ("IDEA") claims were not moot where plaintiff's minor child "remain[ed] eligible for and interested in enrollment in the school district"); Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1041 (5th Cir. 1989) (holding that plaintiff's Education of the Handicapped Act claims were not moot where plaintiff's parents had removed him from former school system, but he remained "a citizen of the State of Texas and, thus, . . . entitled to a free appropriate public education in the state").

As S.J.W.'s parents have expressed an intent to re-enroll him at Peck Slip should they obtain favorable relief, and there is no indication that S.J.W. is ineligible to do so, the claims for declaratory and injunctive relief are not moot at least as to S.J.W., because a favorable decision from this Court would still inure to S.J.W.'s benefit.  See Essen v. Bd. of Educ., No. 92-CV-1164-FJS-GJD, 1996 WL 191948, at *5 (N.D.N.Y. Apr. 15, 1996) (finding plaintiff's request for declaratory and injunctive relief under IDEA not moot where parents indicated intent to return to school district "once a suitable educational program is established" and maintained a home and permanent residence in school district); cf. Russman v. Bd. of Educ., 260 F.3d 114, 119 (2d Cir. 2001) (finding student's IDEA claims moot where student had received Individualized Education Program diploma, was no longer attending school, public or parochial, and her parents had expressed no intention to re-enroll her in the future).  Because there is clearly a live case or controversy as to S.J.W., upon which the claims for declaratory and injunctive relief are premised,[1] Defendants' motion to dismiss for lack of jurisdiction is denied.

---

[1]     Plaintiffs' claims for declaratory and injunctive relief seek identical relief premised on the allegations as to both children, K.W. and S.J.W.  (See FAC ¶¶ 308-17.)  Plaintiffs do not argue, nor is it apparent, that the claims should fail if found moot as to K.W. only.

Rule 12(b)(6) Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This requirement is satisfied when the factual content in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted), but a complaint that contains only "naked assertion[s]" or "a formulaic recitation of the elements of a cause of action" does not suffice. Twombly, 550 U.S. at 555, 558. "In deciding a Rule 12(b)(6) motion, a court assumes the truth of the facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff." Sara Designs, Inc. v. A Classic Time Watch Co. Inc., 234 F. Supp. 3d 548, 554 (S.D.N.Y. 2017).

Section 1983 Monell Claims Against Municipal Defendants

Defendants move to dismiss the Section 1983 claims brought against the Municipal Defendants, asserting that Plaintiffs fail to allege that their rights were violated due to an official policy or custom, and fail to demonstrate a causal connection between any alleged policy and their constitutional claims, as required under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). (Defs. Mem. 10-12.)

Monell establishes that, when a plaintiff sues a municipality or a municipal agency under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing; the plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. See Connick v. Thompson, 563 U.S. 51, 60 (2011). To bring a viable claim under Section 1983 against a municipality, a plaintiff must therefore allege facts showing that the municipality acted pursuant to a custom,

policy, or practice and that such custom, practice or policy caused the claimed rights violation. Monell, 436 U.S. at 690-91. In short, "[t]he elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 97 (2d Cir. 2020).

Plaintiffs appear to offer two theories in support of their Monell claims against the Municipal Defendants. First, citing to academic studies that found New York City's school system to be "overwhelmingly segregated by race" (FAC ¶¶ 250-66), Plaintiffs assert that the DOE has "intentionally perpetuated a system of segregated public schools." (Pls. Mem. at 16.) Second, Plaintiffs allege that the DOE, BOE, and District 2 have a practice of "deliberate indifference to complaints about racial harassment" as evidenced by the "consistent indifference of three different superintendents, an executive superintendent, DOE's General Counsel, and the DOE Chancellor" to Plaintiffs' complaints of racial harassment. (FAC ¶ 289; Pls. Mem. at 13-14.) Defendants argue that both theories are insufficient to state a viable Monell claim, and, in any case, that the Monell claims are improperly asserted as against District 2, as District 2 is not a "final policymaker" for Monell purposes. (Defs. Mem. at 13-14.) The Court begins by addressing Defendants' arguments against District 2, before turning to Plaintiffs' two theories of Monell liability.

### Relevant "Final Policymakers"

Defendants argue that Plaintiffs fail to state a claim under Monell against District 2. To hold a municipality liable under Section 1983 for actions taken by government officials or bodies that caused an alleged violation of a plaintiff's rights, the plaintiff must show that the relevant official or body had "final policymaking authority for the local governmental actor concerning the action alleged to have caused" the particular violation at issue. McMillian v.

Monroe County, 520 U.S. 781, 785 (1997).  The Supreme Court has held that "whether a

particular official has final policymaking authority is a question of state law."  Hurdle v. Bd. of

Educ., 113 F. App'x 423, 424 (2d Cir. 2004) (quoting City of St. Louis v. Praprotnik, 485 U.S.

112, 123 (1988)).  In New York City, the BOE and the Chancellor "are responsible for policy

having city-wide impact."[2]  Agosto, 982 F.3d at 99 (quoting N.Y.C. Sch. Bds. Ass'n v. Bd. of

Educ. of City Sch. Dist., 347 N.E.2d 568, 573 (N.Y. 1976)).

      Defendants argue that Plaintiffs' Monell claims must therefore be dismissed, at

least as against District 2, because District 2 is not properly considered a final policymaker for

Monell purposes.[3]  Defendants cite Boncoeur v. Harverstraw-Stony Point Central School

---

[2]     Section 2590-b of the Education Law dictates the composition of the thirteen-member "board of education for the city school district of the city of New York."  N.Y. EDUC. LAW § 2590-b(1)(a).  Pursuant to bylaws adopted by the BOE, the Board, together with the "Chancellor, superintendents, community and citywide education councils, principals, and school leadership teams" was designated as the Department of Education of the City of New York.  Bylaws of the Panel for Educational Policy of the City School District of the City of New York ("Bylaws") §§ 1.1-1.3; see also D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 506 n.1 (2d Cir. 2006) ("The New York City Board of Education has been renamed the 'New York City Department of Education.'").  The thirteen-member Board also designated itself via bylaws as the "Panel for Educational Policy" ("PEP"), which continues to serve as the governing body over the broader Department of Education.  Bylaws §§ 1.2, 2.1.  The Chancellor serves as a non-voting, ex-officio member of the PEP.  Id. §§ 3.1-3.2; N.Y. EDUC. LAW § 2590-b(1)(a)(2).  As the City does not seek dismissal of one of the two entities, i.e., the BOE and DOE, or differentiate between the two, the Court will treat allegations as to both entities to be sufficiently alleged as against the Board, as courts have since the re-designation of the BOE.  See, e.g., D.D., 465 F.3d at 506 n.1; A.R. ex rel. R.V. v. N.Y.C. Dep't of Educ., 407 F.3d 65, 67 n.2 (2d Cir. 2005).

[3]     Defendants also argue that the Monell claims against the Individual Defendants should also be dismissed on this basis.  (Defs. Mem. at 13-14.)  However, Plaintiffs assert Section 1983 claims against the Individual Defendants in their individual capacities only.  (FAC ¶¶ 44, 49.)  As Defendants make no argument as to the viability of Plaintiffs' Section 1983 claims against the Individual Defendants in their individual capacity, these claims will move forward.  To the extent Defendants seek to argue that the Municipal Defendants may not be held liable under Monell for the actions of the Individual Defendants, the viability of Plaintiffs' Monell claims against the Municipal Defendants is explored in the sections that follow.

District, No. 20-CV-10923-KMK, 2022 WL 845770 (S.D.N.Y. Mar. 22, 2022), for the proposition that "the decisions of all officials under [the BOE]—even the Superintendent of a school district—'constitute mere recommendations that must ultimately be adopted by the final policymaking body' (i.e., the BOE)." (Defs. Mem. at 14.) However, as Plaintiffs point out, the court in Boncoeur relied on an Article of the Education Law governing "Union Free School Districts," which establishes a centralized board of education for such districts, rather than the Articles governing New York City's "Community School District System," i.e., Articles 52 and 52-A. (Pls. Mem. 20 n.7.)

As relevant here, Section 2564 of the Education Law dictates that "[t]he board of education of the city school district of the city of New York . . . shall divide the city school district into such number of local school board districts as such board in its discretion may determine" and, "with the approval of the regents,"

> [T]he board of education . . . shall have the power to delegate to such local school boards any or all of its functions, powers, obligations and duties in connection with the operation of the schools and programs under its jurisdiction, and may modify or rescind any function, power, obligation and duty so delegated.

N.Y. EDUC. LAW § 2564(1), (3). See also Bd. of Educ. of Cmty. Sch. Dist. No. 29 v. Fernandez, 81 N.Y.2d 508, 513-14 (N.Y. 1993) (explaining the history of the so-called "Decentralization Law" as of 1993); Toth ex rel. Toth v. Bd. of Educ., No. 07-CV-3239-SLT-JO, 2008 WL 4527833, at *6-7 (E.D.N.Y. Sept. 30, 2008) (holding that community school districts are suable entities). The Education Law specifically grants each community district education council, the governing body of each community district, the "powers and duties to establish educational policies and objectives" for such district, as set forth in Section 2590-e of the Education law, so

long as such policies and objectives are not inconsistent with the provisions of Article 52-A and the policies established by the BOE.  N.Y. EDUC. LAW § 2590-e.

Plaintiffs appear to allege that, consistent with these provisions, the BOE has delegated to District 2 final policymaking authority to address the alleged racial harassment Plaintiffs experienced (see FAC ¶ 39 ("District 2 is also authorized by law to create district-wide policies to further regulations of the DOE and Chancellor."); id. ¶ 295), at least within the confines of District 2, and Defendants do not engage with Plaintiffs' arguments concerning the lack of clarity regarding the scope of District 2's policymaking authority.  (See Pls. Mem. at 20-22; docket entry no. 38 ("Reply Mem.") at 9 n.3 (arguing summarily that Plaintiffs "misread Agosto and . . . are incorrect about District 2")).  Moreover, neither party has identified case law specifically addressing the scope of a community school district's policymaking authority within such district with regard to the discipline or prevention of student-on-student harassment under New York Law.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (noting "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority" (emphasis added)).  In view of these deficiencies, and the Court's obligation to read the allegations in the light most favorable to the Plaintiffs at this preliminary stage of litigation, the Court denies the Motion insofar as it seeks dismissal of Plaintiffs' Section 1983 claims against District 2.

### Monell Theory 1: City-Wide Policy of Segregation

Turning to Plaintiffs' theories of Monell liability, Plaintiffs' first theory regarding a City-wide policy of segregation is insufficient to frame a viable claim.  Even assuming that the allegations concerning the DOE's purportedly segregated school system were sufficient to show a policy, custom, or practice for Monell purposes, Plaintiffs have not proffered facts

demonstrating a causal connection between the DOE's alleged custom of maintaining a segregated school system and the alleged deprivation of their children's constitutional rights. See Agosto 982 F.3d at 97; (Pls. Mem. 16-20.) Plaintiffs allege that "Peck Slip's student body is predominantly white" and that, during "the 2020-2021 school year, 7% of Peck Slip students identified as Black and 48% identified as white, while throughout District 2, 14% of students identified as Black and 25% identified as white." (FAC ¶¶ 257-58.) Plaintiffs further allege that "K.W. was the only Black student in her Pre-K class and one of two Black students in all of the Pre-K classes at Peck Slip." (Id. ¶ 53.) However, these demographics alone are insufficient to demonstrate plausibly that the alleged bullying and indifference to the Plaintiffs' complaints were products of a policy of racial segregation and thus do not provide the causal link required to support a Monell claim. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."); Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012); see also Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000). Accordingly, Plaintiffs' Monell claims, to the extent such claims are premised on a purported policy of City-wide segregation, are dismissed.

<u>Monell Theory 2: Deliberate Indifference to Student Harassment</u>

Plaintiffs do, however, plead sufficient allegations to attach Monell liability to the Municipal Defendants based on the alleged "deliberate indifference" of these entities towards Plaintiffs' complaints of student harassment and bullying at Peck Slip. A plaintiff can allege the existence of an official policy or custom by proffering facts showing:

> (1) A formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to

> properly train or supervise subordinates to such an extent that it amounts
> to deliberate indifference to the rights of those with whom municipal
> employees will come into contact.

<u>T.J. ex rel. B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.</u>, No. 17-CV-9592-JCH, 2019 WL

13170168, at *10 (S.D.N.Y. Sep. 30, 2019).  Reading the complaint liberally in their favor,

Plaintiffs' allegations that "DOE, BOE, and District 2 officials and employees were deliberately

indifferent to harassment of K.W. and S.J.W. based on their race, and that this deliberate

indifference caused K.W. and S.J.W. to be subjected to" the bullying and harassment described in

the FAC (FAC ¶ 289), suggest that Plaintiffs are seeking to allege either a widespread, consistent

practice providing implied notice to policymakers or inadequate training or supervision to such

an extent that it constitutes deliberate indifference.

  Under the fourth category of viable <u>Monell</u> policies or customs, and as relevant

here, "[a] school district may be held liable for inadequate training, supervision[,] or hiring

where the failure to train, hire[,] or supervise amounts to deliberate indifference to the rights of

those with whom municipal employees will come into contact."  <u>T.E. v. Pine Bush Cent. Sch.</u>

<u>Dist.</u>, 58 F. Supp. 3d 332, 376 (S.D.N.Y. 2014) (citation omitted).  "Only where a municipality's

failure to train evidences a deliberate indifference to the rights of its inhabitants can such a

shortcoming be properly thought of as a city policy or custom" for <u>Monell</u> purposes.  <u>T.J.</u>, 2019

WL 13170168, at *11 (citation and internal quotation marks omitted).  "A pattern of similar

constitutional violations by untrained employees is ordinarily necessary to demonstrate

deliberate indifference for purposes of failure to train."  <u>Connick v. Thompson</u>, 563 U.S. 51, 62

(2011).

  To adequately allege a failure to train amounting to deliberate indifference, a

plaintiff must establish:

> (1) that the policymaker knows to a moral certainty that [their] employees
> will confront a given situation (2) that the situation presents the employee
> with a difficult choice of the sort that training or supervision will make
> less difficult or that there is a history of employees mishandling the
> situation and (3) that the wrong choice by the city employee will
> frequently cause the deprivation of a citizen's constitutional rights.

T.J., 2019 WL 13170168, at *11 (quoting Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks omitted)), accord City of Canton v. Harris, 489 U.S. 378, 389-90 (1989).

Similarly, to state a claim under the third category of Monell liability—"a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials" T.J., 2019 WL 13170168, at *10—a "plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Jones, 691 F.3d at 81. "The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011). In determining whether this "stringent standard" has been met at the pleading stage, Cash, 654 F.3d at 334, courts have applied the same three-pronged standard that governs failure-to-train claims, set forth in the preceding paragraph. See Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) ("Although City of Canton addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims."); Buari v. City of New York, 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021).

In the cases of T.E. and T.J. ex rel. B.W., the district courts applied this three-prong test at the summary judgment and motion to dismiss stages, respectively, to evaluate the viability of Equal Protection claims brought under Section 1983. 58 F. Supp. 3d at 376-77; 2019

WL 13170168, at *11.  Those cases, like the instant case, concerned school bullying, and the T.E. and T.J. courts ultimately found dismissal of the claims to be inappropriate where each of the three prongs were met.  The facts of this case, as pleaded in the FAC, largely parallel those of T.E. and T.J. ex rel. B.W.

    For the first prong of the test, Plaintiffs plead sufficient facts to support an inference that the Municipal Defendants, as final policymakers, had actual knowledge that Peck Slip employees would confront the issue of student-on-student racial harassment and bullying. In T.E., the court found that there was an issue of material fact as to whether the Board of Education for the Pine Bush Central School District, as official policymaker, had actual knowledge of the plaintiffs' alleged student-on-student anti-Semitic harassment, noting that, "[one of the plaintiffs' mothers] copied at least one member of the . . .  School Board on four emails informing administrators that the harassment of her daughter for three years 'escalated every year,'" and that one of the Board members had been present during a meeting in which parents "discussed multiple incidents of anti-Semitic harassment" that certain of the plaintiffs had faced.  T.E., 58 F. Supp. 3d at 377.  In T.J. ex rel. B.W., the court found that the plaintiff had alleged sufficient facts to survive a motion to dismiss where the plaintiff had filed due process complaints with the School Board, a final policymaker for Monell purposes, regarding the physical and verbal bullying T.J. was subjected to by peers on the basis of his sexual orientation. T.J., 2019 WL 13170168, at *12.  The T.J. court noted that, "[e]ven if it is unclear that the School Board had notice of the bullying" during the two prior school years, the due process complaints filed in July 2016 "put the School District on notice of the need for training."  Id.

Here, Plaintiffs similarly allege that they repeatedly notified the Municipal Defendants, each final policymakers for purposes of this Motion,[4] of the student-on-student harassment at Peck Slip.  Plaintiffs specifically allege that they filed a complaint through DOE's online portal in February 2018, after which point Mr. Winbush was contacted by and met with a representative for District 2.  (FAC ¶¶ 70-74.)  Plaintiffs also allege that Mr. Winbush later contacted City Councilwoman Margaret S. Chin and New York State Senator Kevin Parker, who, "[u]pon information and belief, . . . brought [the issue of K.W.'s racial harassment] to the attention of DOE officials in or around April 2018" (id. ¶¶ 81-82), resulting in two meetings with the District 2 Superintendent in May 2018, where "the racism, harassment, and emotional and mental abuse that K.W. was experiencing at Peck Slip" was discussed.  (FAC ¶¶ 86-90.)  Mr. Winbush allegedly contacted the District 2 Superintendent and District 2 Executive Superintendent again following incidents in December 2019.  (Id. ¶¶ 102-104.)  Finally, Plaintiffs allege that they sent letters to various school and DOE officials on February 1, 2019, including the District 2 Superintendent and DOE General Counsel, and on February 9, 2023, including the DOE Chancellor, DOE General Counsel, and District 2 leadership, detailing bullying and retaliation that K.W. and S.J.W. faced at Peck Slip.  (FAC ¶¶ 221-23.)  These allegations, read in a light most favorable to the Plaintiffs, support the inference that the Municipal Defendants knew that Peck Slip employees faced, and would continue to face, the problem of student-on-student racial harassment and bullying.[5]

---

[4]     See discussion supra pp. 12-15 (discussing District 2's alleged final policymaker status).

[5]     The Court notes that, even if it were found that District 2 is not a policymaker for Monell purposes, the repeated complaints to DOE (FAC ¶¶ 70-74; 81-82; 221-23), which resulted in outreach by District 2 on at least two occasions (id. ¶¶ 70-74, 81-82; 86-90), would be sufficient to "put the School District [and the DOE] on notice of the need for training." T.J., 2019 WL 13170168, at *12.

Plaintiffs also meet the second and third prongs, as they plead ample facts establishing a history of Peck Slip employees allegedly mishandling student harassment and bullying complaints, thereby depriving K.W. and S.J.W. of their constitutional right to an education free from racial discrimination.  See T.E., 58 F. Supp. 3d at 378; (See FAC ¶¶ 97-116; 135-77; 231-32.)  For example, Plaintiffs allege that K.W. was attacked by four White students who kicked and hit her in the legs and stomach during recess and that, when K.W.'s father emailed Principal Siena on January 15, 2020, about this ongoing racialized bullying of K.W. by her peers, that "Principal Siena took no meaningful steps to respond to Mr. Winbush's complaint and again dismissed his pleas."  (FAC ¶¶ 105-109.)  In another incident in January 2020, three White students gave K.W. "a racist picture they had drawn of her with a big butt," and K.W.'s father notified Principal Siena of this incident on January 22, 2020.  (Id. ¶¶ 110-111.)  In the following week, after a White male student taunted K.W., Principal Siena pulled K.W. out of the classroom to talk to her, but did not discipline the student who had taunted her.  (Id. ¶¶ 112-13.)

Plaintiffs allege similar facts demonstrating that Peck Slip employees mishandled complaints that S.J.W. suffered student bullying.  Plaintiffs allege that, when S.J.W. was a pre-K student during the 2021-2022 school year, a White student punched S.J.W. in the face and later told him that his skin was the "color of pooh."  (FAC ¶¶ 138-39.)  Plaintiffs allege they notified S.J.W.'s teacher, who said that she could not help, and that other school administrators did not any engage in any action to prevent the White student from bullying S.J.W.  (Id. ¶ 140.)  The same White student punched S.J.W. in the face later that same month.  (Id. ¶ 142.)  When Mr. Winbush emailed AP Corey regarding the latter attack, Plaintiffs contend that AP Corey dismissed the concern and defended the White student, who later threatened to kill S.J.W.  (Id. ¶¶ 147-51.)  Similarly, on October 3, 2022, when S.J.W. was in Kindergarten, another student

threatened to kill him and kicked him in the stomach. (<u>Id.</u> ¶¶ 165-67.) AP Corey initially told Mr. Winbush that she would do her best to separate them, but stated that she would not remove the child nor suspend him from class. (<u>Id.</u> ¶ 167.) This student continued to be assigned to sit at the same table as S.J.W. as late as January 2023, months after Mr. Winbush made multiple complaints to Principal Siena and Assistant Principal Corey that the children should be separated. (<u>Id.</u> ¶¶ 165-74.) On January 31, 2023, the same student who had previously threatened to kill S.J.W. spat in his face without provocation. (<u>Id.</u> ¶ 176.) These allegedly inadequate responses by Peck Slip administrators to the bullying faced by K.W. and S.J.W were highlighted in the correspondence with the Municipal Defendants outlined above. (<u>Id.</u> ¶¶ 70-73, 82, 86-90, 102-103, 219-22.)

Reading the allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have pleaded sufficient facts to support the inference that the Municipal Defendants knew that students at Peck Slip would face racialized bullying and harassment from their peers, that there was a history of Peck Slip administrators mishandling complaints of student bullying and failing to appropriately intervene, and that the wrong choice by Peck Slip administrators frequently deprived K.W. and S.J.W. of their constitutional right to an education free from racial discrimination. Because Plaintiffs have therefore sufficiently pleaded a Section 1983 claim premised on either a widespread practice or failure-to-train theory of liability amounting to deliberate indifference under <u>Monell</u>, Defendants' motion to dismiss the <u>Monell</u> claims is denied as to the Municipal Defendants.

<u>Title VI and Section 1983 Statute of Limitations</u>

Defendants also seek dismissal of Plaintiffs' Title VI and Section 1983 claims as untimely, to the extent the claims are premised on allegations of events that occurred prior to

July 2, 2019.  (Defs. Mem. 7-8.)  "Although Title VI does not contain an express statute of limitations, in New York, such claim falls within the three-year statute of limitations applicable to personal injury causes of action."  Al-Haideri v. Trs. of Columbia Univ. in City of New York, 2007 WL 2187102, at *2 (S.D.N.Y. July 26, 2007).  Similarly, claims arising under Section 1983 when brought in this district are governed by New York's statute of limitations for personal injury actions.  See N.Y. C.P.L.R. § 214; Rich v. New York, No. 21-CV-3835-AT, 2022 WL 992885, at *8 (S.D.N.Y. Mar. 31, 2022).  The statute of limitations for both Plaintiffs' Title VI and Section 1983 claims is therefore ordinarily three years.

Where federal courts are required to borrow state statutes of limitation, the state's tolling rules also apply.  See Bd. of Regents of Univ. of the State of N.Y. v. Tomanio, 446 U.S. 478, 483 (1980).  On March 20, 2020, in light of the COVID-19 pandemic, then-New York Governor Cuomo issued Executive Order 202.8, which tolled the applicable New York statute of limitations.  See Rich, 2022 WL 992885, at *8.  Governor Cuomo later extended the tolling period until November 3, 2020, ultimately tolling the statute of limitations for a total of 229 days.  See Ndemenoh v. Boudreau, No. 20-CV-4492-RA, 2023 WL 6122852, at *4 (S.D.N.Y. Sept. 19, 2023).  Courts in this district have concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for Section 1983 claims. Rich, 2022 WL 992885, at *8 (citing Lewis v. Westchester County, No. 20-CV-9017, 2021 WL 3932626, at *2 n.3 (S.D.N.Y. Sept. 2, 2021)).  As Plaintiffs filed their original complaint on February 16, 2023 (see docket entry no. 1), Plaintiffs' claims therefore must have accrued before July 2, 2019, to be timely, which is the date three years and 229 days prior to February 16, 2023. See Rich, 2022 WL 992885, at *8; (see also Defs. Mem. at 9 n.3.)

Plaintiffs attempt to invoke the continuing violation doctrine to the extent their claims are premised on incidents prior to this date, July 2, 2019—i.e., those incidents prior to the 2019-2020 school year.  (See Pls. Mem. at 8-12.)  In certain limited circumstances, a plaintiff can invoke the doctrine to challenge conduct that is otherwise time-barred by showing the existence of "specific ongoing discriminatory polic[i]es or practices, or where specific instances of discrimination are permitted . . . to continue unremedied for so long as to amount to a discriminatory policy or practice."  Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994); see also Trinidad v. N.Y.C. Dep't of Corr., 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (noting that the continuing violation doctrine "is heavily disfavored in the Second Circuit").  The question for the Court is whether the claims are "composed of a series of separate acts that collectively constitute one unlawful . . . practice," Lucente v. County of Suffolk, 980 F.3d 284, 309 (2d Cir. 2020), rendering it appropriate to delay "the commencement of the statute of limitations period until the last act in furtherance of [such practice]."  Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999) (citations and internal quotation marks omitted).

"To trigger the continuing violation doctrine in the context of an Equal Protection claim, a plaintiff 'must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy.'"  Lucente, 980 F.3d at 309 (citation omitted).  Furthermore, "as it relates to a Monell claim, a plaintiff 'will need to allege the persistence of the municipal policy and non-time-barred acts indicating the acquiescence of policy-making officials in subordinates' misconduct.'"  Id.  As explained in the foregoing section, Plaintiffs have pleaded sufficient facts to state a Monell claim based on an ongoing custom or practice of deliberate indifference by the Municipal Defendants, premised on the pleaded incidents involving both K.W. and S.J.W. that were allegedly inadequately remedied by

Defendants between 2016 and the time the FAC was filed in 2023.[6]  These incidents are similar

to those that comprise a hostile work environment claim, a context in which the continuing

violation doctrine is more commonly applied, as each alleged incident may not be individually

actionable, but the purportedly discriminatory conduct in the aggregate forms the necessary

"pattern of similar constitutional violations" to support a claim.  Connick, 563 U.S. at 62; see

also, e.g., Williams v. N.Y.C. Dep't of Educ., No. 19-CV-1353-CM, 2019 WL 4393546, at *7

(S.D.N.Y. Aug. 28, 2019) (noting that "creation of a hostile work environment over time is the

quintessence of a continuing violation" (citations omitted)); cf., e.g., Chin v. Port Auth. of N.Y.

& N.J., 685 F.3d 135, 157 (2d Cir. 2012) (refusing to apply continuing violation doctrine in

context of employment discrimination claim, where "each discrete act necessarily constitute[d] a

separate actionably unlawful employment practice," as opposed to "incidents that comprise a

hostile work environment claim" (citation and internal quotation marks omitted)).

Moreover, these alleged incidents continued into the three-year statute of

limitations period for Plaintiffs' Section 1983 claim as to each of the student-plaintiffs, K.W. and

S.J.W.  (See, e.g., FAC ¶¶ 100-104 (alleging that four White students spat food in K.W.'s face

and down her shirt repeatedly in December 2019, and went undisciplined); id. ¶¶ 110-11

---

[6]       Defendants argue that the allegations as to multiple plaintiffs cannot be considered in the
aggregate for determining whether a continuing violation is present.  (Reply Mem. at 3
n.1.)  However, in the case of Lucente, the Second Circuit considered an individual
defendant's "sexual misconduct with female inmates" in finding that there was a policy
of acquiescence to that misconduct on the part of Suffolk County.  Lucente, 980 F.3d at
309 (emphasis added).  In this case, the allegations of both K.W. and S.J.W. similarly
form the basis of Plaintiffs' Monell claims asserting that the Municipal Defendants were
on notice of, but did not remedy, the inadequate response of Peck Slip employees to the
student-plaintiffs' harassment.  See Connick, 563 U.S. at 62 (noting that "[a] pattern of
similar constitutional violations by untrained employees is ordinarily necessary to
demonstrate deliberate indifference for purposes of failure to train." (emphasis added)).

(alleging that three White students gave K.W. a "racist picture they had drawn of her with a big butt," which was reported to Principal Siena by Mrs. Winbush in January 2020); id. ¶¶ 165-77 (alleging that student who repeatedly assaulted and threatened to kill S.J.W. between October 2022 and January 2023 was not adequately separated from S.J.W. as promised by Peck Slip officials, leading to a further incident in January of 2023 in which S.K.W. "spat in S.J.W.'s face without provocation").)  Reading the FAC in the light most favorable to Plaintiffs, Plaintiffs have sufficiently alleged "the persistence of the municipal policy and non-time-barred acts indicating the acquiescence of policy-making officials in subordinates' misconduct," such that the application of the continuing violation doctrine to Plaintiffs' Section 1983 claims against the Municipal Defendants is appropriate.  Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009); see also Lucente, 980 F.3d at 310 (finding that continuing violation doctrine applied to Section 1983 Equal Protection claim, where Monell claim was premised on ongoing discriminatory policy of Suffolk County and evidence was sufficient to survive summary judgment).

Where the continuing violation doctrine is found applicable to a Monell claim against a municipal entity, the Second Circuit has also found it appropriate to apply the doctrine to Section 1983 claims asserted against individual actors whose conduct forms the basis for municipal liability, so long as there are allegations of "an unconstitutional act committed by each particular defendant that falls within the three-year statutory period."  Lucente, 980 F.3d at 310 (citation omitted).  The FAC contains allegations of Principal Siena and AP Corey's deliberate indifference during the three-year statutory period (see, e.g., FAC ¶ 112 (after K.W. reported taunting by a White male student in January 2020, Principal Siena "pulled K.W. out of the class room, spoke to her in an aggressive manner inches from her face," and, in contrast to K.W., "did

not make the student who was taunting K.W. leave the classroom to discuss the incident"); id.
¶¶ 165-177 (after second student threatened to kill S.J.W. and kicked him in the stomach,
resulting in stomach pains and a doctor's visit, Mr. Winbush emailed school administrators
asking that the offending child be separated from S.J.W. and removed, but AP Corey "minimized
the incident," "stated the best she could do was separate them," and then failed to do so
adequately)), the allegations supporting the Section 1983 claims against the Individual
Defendants, as pleaded in the FAC, are also sufficient at this stage to support application of the
continuing violation doctrine.

Finally, the Title VI claims are premised on the same theory of liability as the
Section 1983 claims, deliberate indifference to K.W. and S.J.W.'s ongoing harassment (compare
FAC ¶ 289, with id. ¶ 295), and Plaintiffs do not seek to dismiss Plaintiffs' Title VI claims on the
merits at this time.  It would seem incongruous to determine that a continuous course of conduct
amounting to a custom or practice for Monell purposes sufficiently tolled the statute of
limitations under Section 1983 as pleaded, but that the same course of conduct did not
sufficiently constitute "one unlawful practice" when pleaded in support of an additional, separate
statutory violation claim.  Cf. Valtchev v. City of New York, 400 F. App'x 586, 588-89 (2d Cir.
2010) (noting that "multiple incidents of discrimination, even similar ones, that are not the result
of a discriminatory policy or mechanism do not amount to a continuing violation" (citation
omitted)).  The Court, accordingly, is not persuaded at this time that the statute of limitations
operates as a bar to Plaintiffs' Section 1983 or Title VI claims to the extent these claims are
premised on incidents that occurred prior to July 2, 2019.

Request for Stay of Discovery on Plaintiffs' Monell Claims

Defendants also move to stay discovery on Plaintiffs' Monell claims against the

Municipal Defendants, if such claims are permitted to move forward, pending the completion of discovery on Plaintiffs' claims against the Individual Defendants.  (Defs. Mem. 14.)

A district court has considerable discretion to stay discovery upon a showing of good cause pursuant to Federal Rule of Civil Procedure 26(c).  In determining whether to stay discovery, a court should weigh, "the breadth of discovery sought, the burden of responding to it, the prejudice that would result to the party opposing the stay, and the strength of the pending motion forming the basis of the request for stay."  Republic of Turkey v. Christie's, Inc., 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018).  In litigation involving Section 1983 Monell claims and claims asserting individual liability of state actors, courts in this Circuit have, in appropriate circumstances, stayed discovery or bifurcated the Monell claims until after the plaintiff established liability of the individual defendants.  See, e.g., Oliver v. City of N.Y., 540 F. Supp. 3d 434, 436 (S.D.N.Y. 2021).  The rationale proffered for this dual-track for Section 1983 claims is that, "since the City's liability is derivative of the individual defendants' liability, and since the proof required to establish a Monell claim is substantially different from the proof necessary to establish individual liability," it can be more economical and efficient to first establish the liability of the individual actors, which can involve much more limited discovery than discovery on the Monell claim.  See Rodriguez v. City of New York, No. 21-CV-1649-AMD, 2022 U.S. Dist. LEXIS 195034, at *3 (E.D.N.Y. Oct. 20, 2022).

Defendants likewise assert that staying discovery on the Monell claims is economical because "discovery in this case will be extensive as to the Individual Defendants alone, even without delving into decades of desegregation efforts in New York City and the current status of racial integration of its schools."  (Defs. Mem. at 15.)  Plaintiffs counter that, because Defendants do not dispute the sufficiency of Plaintiffs' timely Title VI claims, staying

discovery on the asserted <u>Monell</u> claims would be unworkable, as "[e]vidence that is relevant to Plaintiffs' <u>Monell</u> claims will be equally relevant to Plaintiffs' Title VI claims."  (Pls. Mem. at 22.)  The Court finds merit in Plaintiffs' argument, given the substantial overlap in Plaintiffs' theories of liability under Title VI and Section 1983.  (<u>Compare</u> FAC ¶ 289, <u>with</u> <u>id.</u> ¶ 295.) Plaintiffs' position is further supported by the fact that (1) Plaintiffs' <u>Monell</u> claims against the Municipal Defendants will move forward on a "deliberate indifference" theory, premised in part upon the actions of the Individual Defendants, <u>see</u> <u>Jenkins</u>, 478 F.3d at 94 (holding that the test for deliberate indifference requires a showing that there was a history of employees mishandling a situation that would lead to the plaintiff experiencing a constitutional violation); and (2) the Court has dismissed Plaintiffs' <u>Monell</u> claims to the extent such claims are premised on the more expansive theory of liability alleging a City-wide policy of segregation, which appears to be Defendants' primary concern.  (<u>See</u> Defs. Mem. at 15; Reply Mem. at 4 n.2.)  Moreover, the Court retains discretion under Federal Rule of Civil Procedure 26(b) to curtail discovery "[t]o the extent that discovery requests are burdensome . . . or constitute fishing expeditions."  <u>Lopez v. City of New York</u>, No. 20-CV-2502-LJL, 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021) (rejecting City request to bifurcate discovery related to plaintiff's municipal liability claims under <u>Monell</u>).  Accordingly, Defendants' motion to stay discovery on the <u>Monell</u> claims against the Municipal Defendants is denied with respect to the surviving deliberate indifference theory of liability under <u>Monell</u>.

<u>Title VI Claim for Emotional Distress Damages</u>

Defendants also move to "bar Plaintiff from asserting compensatory damages for emotional distress" under Title VI.  (Defs. Mem. 20.)  As Plaintiffs disclaim any desire to seek

emotional distress damages under Title VI (Pls. Mem. at 25), the motion to dismiss Plaintiffs'

emotional distress damages claim under Title VI is denied as moot.

NYSHRL Claim

Finally, Defendants move to dismiss Plaintiffs' NYSHRL claim due to Plaintiffs'

failure to file a notice of claim as required by section 3813 of the New York Education Law

("Section 3813").  (Defs. Mem. 19.)  Plaintiffs do not dispute that they have not filed a notice of

claim, but argue that the requirement does not apply to this case.  (FAC ¶ 321.)

Section 3813 requires a plaintiff to file a notice of claim within three months after

accrual of the claim and prior to initiating a lawsuit against a school, school district, board of

education, or education officer.  See N.Y. EDUC. LAW § 3813(1).  Courts have found that

principals do not qualify as officers for purposes of Section 3813.  See Collins v. City of New

York, 156 F. Supp. 3d 448, 460 (S.D.N.Y. 2016) ("Superintendents qualify as officers upon

whom a notice of claim must be filed, but principals do not.").  The Court therefore denies the

motion insofar as it seeks dismissal of the NYSHRL claim, Count Seven, against Principal Siena

and AP Corey, and limits the following analysis to the claims against the Municipal Defendants.

Plaintiffs cite Margerum v. City of Buffalo, 24 N.Y.3d 721 (2015), to assert that a

notice of claim is not required for their NYSHRL claim as against the Municipal Defendants.

(FAC ¶ 321; Pls. Mem. at 24.)  However, Margerum only concerned the General Municipal

Law's ("GML") notice of claim requirement for tort actions when claims are brought under the

NYSHRL, as the Margerum Court found that NYSHRL claims did not sound in tort.  See

Margerum, 24 N.Y.3d at 730 (holding that GML notice of claim requirement not required for

NYSHRL claims, as "[h]uman rights claims are not tort actions under [GML section] 50-e and

are not personal injury, wrongful death, or damage to personal property claims under [GML

section] 50-i").

   In contrast to the GML's notice of claim requirement, which is limited to claims

sounding in tort, Section 3813's notice of claim criteria are written in considerably broader

terms, applying to any "action or special proceeding, for any cause whatever," subject to limited

exceptions set forth in Section 3813.  See N.Y. EDUC. LAW § 3813(1) (emphasis added).  Courts

have therefore interpreted the Education Law's notice of claim requirement to apply to claims

brought under the NYSHRL, notwithstanding the New York Court of Appeals' decision in

Margerum.  See, e.g., Seifullah v. City of New York, 161 A.D.3d 1206, 1206-1207 (N.Y. App.

Div. 2d Dep't 2018) (finding plaintiff's reliance on Margerum to excuse notice of claim

requirement under Section 3813 for NYSHRL claims to be "misplaced" in light of the foregoing

reasoning).  Plaintiffs' failure to file a notice of claim under Section 3813 prior to initiating this

litigation therefore bars the NYSHRL claim asserted as Count Seven of the FAC as against the

Municipal Defendants.

   Plaintiffs make two additional, cursory arguments in their opposition papers,

asserting that a notice of claim requirement is also not applicable to (1) claims for equitable or

declaratory relief, or (2) claims seeking to vindicate a public interest.  (Pls. Mem. at 24-25 (citing

Rice v. N.Y.C. Dep't of Educ., 2015 U.S. Dist. LEXIS 152223, at *10 (E.D.N.Y. Nov. 10, 2015).)

However, as Defendants point out, Plaintiffs' NYSHRL claim seeks money damages for alleged

injuries to Plaintiffs.  (FAC ¶¶ 318-22); see Rice, 2015 U.S. Dist. LEXIS 152223, at *10

("[Section 3813] requires notice only with respect to claims for money damages." (emphasis

added)).  Moreover, as "the disposition of [Plaintiffs' money damages] claim was not intended to

nor could it directly affect or vindicate the rights of others," given that the relief sought is

particular to the alleged discrimination that Plaintiffs faced, the action "is properly characterized as one seeking the enforcement of private rights."  Mills v. County of Monroe, 59 N.Y.2d 307, 312 (1983) (rejecting argument similar to Plaintiffs' in context of employment discrimination claims).  Accordingly, neither exception to the notice of claim law contained in Section 3813 applies to Plaintiffs' NYSHRL claim for money damages, as pleaded in Count Seven.

In short, because Plaintiffs concede that they have not filed the notice of claim required by Section 3813 (FAC ¶ 321; see also Pls. Mem. at 24), Defendants' motion to dismiss the NYSHRL claim, Count Seven, is granted as to the Municipal Defendants.

<u>CONCLUSION</u>

For the reasons explained above, Defendants' motion to dismiss the First Amended Complaint is granted in part and denied in part.  Defendants' motion is granted as to the NYSHRL claim (Count Seven) against the Municipal Defendants.  Defendants' motion is also granted as to Plaintiffs' Section 1983 Monell claims (Counts Two and Six), to the extent such claims are premised on a City-wide policy of segregation.  Defendants' motion is denied in all other respects.

This Memorandum Opinion and Order resolves docket entry no. 34.  This case will be referred to the designated magistrate judge for general pretrial management.

SO ORDERED.

Dated: New York, New York
          September 10, 2025

          /s/ Laura Taylor Swain
          LAURA TAYLOR SWAIN
          Chief United States District Judge